[Civil No. 2496. Filed November 15, 1926.]

[250 Pac. 772.]

L. E. WIGHTMAN, MARVEL WIGHTMAN and DEWEY WIGHTMAN, Appellants, v. J. S. KING, Appellee.

Mr. L. L. Henry and Mr. W. D. Moore, for Appellants.

Mr. Jay Good and Mr. Frederic A. Shaffer, for Appellee.

ROSS, J.—J. S. King, in his complaint against the defendants (Wightman), charged them with converting to their own use "twenty-five head of cattle, all ranging in Gila county," the property of plaintiff, and of the value of $875. This was met by a general denial. The parties submitted their evidence to the court, and the court found that defendants had converted six cows, four yearlings and three calves of plaintiff's, of the value of $186, and gave plaintiff judgment for that amount. The defendants have appealed.

The assignments are several, but from the conclusion we have reached it will not be necessary to consider more than one of such assignments. It raises the sufficiency of the evidence to support the findings of fact and the judgment. The undisputed facts, as

developed upon the trial or found by the court, are as follows:

That Henry Mounce and his wife, E. E. Mounce, prior to 1914, and up to May 21, 1924, possessed, occupied and enjoyed certain uninclosed stock ranges in Gila county, upon which stock or range cattle bearing the O Cross and Three Lazy S brands run and grazed, said brands and the right to use the same being their property; that in 1920 the Mounces mortgaged the cattle bearing such brands to the First National Bank of Globe, and in September, 1921, they mortgaged the cattle bearing such brands (estimated at 800 to 1,200 head), and the increase thereof, to Eliza J. Wightman and Rollo Wightman; that thereafter both mortgages were foreclosed in the superior court of Graham county, and said cattle ordered sold; that on May 21, 1924, all of said cattle covered by said mortgages, together with all right, title and interest in and to, and the right to use, the said O Cross and the Three Lazy S brands were, at a sheriff's sale, sold to the defendants.

King lived on the Mounce range, and was the locator of thirty unpatented mining claims over which the Mounce cattle grazed. He obtained his water supply for domestic use and for his stock from a well. The Mounces, in 1914, to compensate him for watering and salting their cattle at his place, gave and delivered to him four head of cows, and later agreed to give him annually four calves for like services.

This suit is for the four head King acquired in 1914, and their increase. The Mounce brands were left on the original four head and placed on the increase. These animals commingled on the range with the other stock with those brands, and were undistinguishable from them so far as marks and brands were concerned. The original four head were actually delivered to King in his inclosure. In the winter he

would feed them. He milked the old cows, and they and their increase were gentle, and well known by King. However, he did not keep them inclosed, but permitted them to range at large with the rest of the cattle bearing the Mounce brands, and the Mounces paid the state and county taxes assessed against them. Neither the First National Bank of Globe nor the Wightmans knew of the arrangement between the Mounces and King at the time they took mortgages upon the Mounce cattle and brands, nor did the Wightmans know of such arrangement at the time they bought the cattle at sheriff's sale.

After the defendants bought the Mounce brands and cattle at the foreclosure sale, King gathered and put into an inclosure twelve head, which he claimed belonged to him, and put on nine of them what he called the JL brand. The defendants' employees opened plaintiff's inclosure, and took the twelve head therefrom, and it is for these twelve head that the court gave the plaintiff judgment.

The question is, Can a buyer of range cattle under a verbal sale leave them, as also the increase, on the range of the seller, in the brands of the seller, and claim them against a mortgagee or purchaser who has, in good faith and without notice, loaned money on them, or purchased them from the seller? To sustain plaintiff's contention this proposition must receive an affirmative answer. It may be admitted that King's right to the cattle claimed was absolute as against the Mounces, but as between King and third persons dealing with the Mounces, without notice or knowledge of such irregular arrangement, a different question arises. Not only were the legal *indicia* of ownership in the Mounces, but the stock remained in and as a part of the common range herd of the Mounces. That they were "range" cattle, as that term is defined by the statutes, we think there

is no question.  Indeed, the plaintiff in his complaint describes the stock as "twenty-five head of cattle, all *ranging* in Gila county," showing that he himself regarded them as range cattle.  The word "range," when used as descriptive of livestock, means livestock that roam and feed upon the open and uninclosed tracts of land in the state, and not in the actual possession or control of the owner or his agent.  The fact that such livestock is occasionally placed in inclosures for temporary purposes does not change them from range stock.  Paragraph 3728, Civil Code.

While the statute does not, in terms, require the owner of range stock to adopt a brand with which to brand his animals, we think the legislative policy is such as to encourage it.  It is the only practical method of identifying ownership of range cattle, and in recognition of that fact it has been adopted by all of the western states engaged in the growing of cattle upon the open and uninclosed ranges.  Accordingly, provision is made for the owner's adoption of a brand and its recordation and use.  The right to use such brand is made a property right that may be sold and transferred (paragraph 3755, Civil Code), and is *prima facie* evidence that the range animal bearing it belongs to the owner of the brand (paragraph 3758, Civil Code).  If the owner sells any range cattle, he must not only make actual delivery thereof, but accompany the delivery with a written acknowledged bill of sale to the purchaser, giving the number, kind, marks and brands of each animal sold and delivered.  Paragraph 3762, Civil Code.  All these provisions, and many others contained in chapter 1, title 30, Civil Code, entitled "Live Stock," indicate a legislative purpose to require one who buys range cattle to do something to segregate his purchase from the herd and brand of the seller and distinguish

them from cattle belonging to other owners of range stock.

The rules appertaining to sales of personal property generally do not apply to sales of range stock on the open and uninclosed range. Whether it is the brand and the right to use it, or individual animals of such brand, that is sold, the sale must be by written bill of sale properly acknowledged; and in the former case recorded with the livestock sanitary board, and in the latter case, in addition to bill of sale, there should be actual delivery. Paragraphs 3755–3762, *supra.*

It seems to us that the arrangement between the Mounces and King, and which we are asked to recognize as lawful, violates the spirit and purpose of the laws of this state regulating the growing and raising of cattle upon the open ranges; and, also, if sustained, it would lay down the bars to all kinds of fraud. If a buyer of range cattle can adopt the seller's range and brand, leave his purchase as a part of the common herd under the actual or ostensible control of the seller, and, when the latter has mortgaged or sold them to *bona fide* mortgagees or buyers, recover from the latter such stock or its value, then the gate is thrown wide open to collusion and fraud. It would be unsafe to deal with the legal brand and range owner, as the *indicia* of ownership would be no protection.

The transaction made the basis of plaintiff's suit does not conform with, but violates, the language and spirit of paragraph 3276, Civil Code, concerning fraudulent conveyances. Such statute reads as follows:

"Every sale made by a vendor of goods and chattels in his possession or under his control, and every assignment of goods and chattels unless the same be accompanied by an immediate delivery, and be followed by an actual and continued change of possession of things sold or assigned, shall be *prima facie*

evidence of fraud as against the creditors of the vendor, or the creditors of the person making such assignment, or subsequent purchasers in good faith.''

Neither the evidence nor the findings of fact show that there was actual and continued change of possession of the cattle after the alleged sale to King, but, on the contrary, such cattle were commingled with and were undistinguishable from the rest of the Mounce cattle. The public, and persons dealing with the Mounces concerning the O Cross and the Three Lazy S brands, would have knowledge of nothing indicating that there had been a change of ownership or possession so long as the Mounce brands were unchanged and the animals were ranging on their ranges and being returned by them for taxation purposes.

The court found as a fact, or rather concluded, that King was the owner of approximately twenty-five head of cattle branded O Cross and Three Lazy S; that they were not covered by the mortgage to the Wightmans, since ''the estimate placed upon the number of cattle located upon such range was 800 to 1,200 head, and there was no evidence to show that there was not in fact from 800 to 1,200 head of cattle upon the ranges aside from those belonging to the plaintiff King; at any rate, the said Mounce had no legal authority to mortgage the cattle belonging to the said plaintiff, and, in view of the fact that no credits were extended on the belief that the particular 25 head of cattle did belong to the mortgagor Mounce, the mortgagee as to such 25 head of cattle was not a *bona fide* purchaser for value, and the interest of the said King must prevail as against the said defendants Wightman.''

Just how the court could draw such a conclusion it is difficult to understand. As heretofore said, the cattle sued for were, as between the Mounces and

King, the latter's property, but to say that the Wightman mortgage did not cover them or that the Mounces had no authority to mortgage them is contrary to all the record evidence. The mortgage, as stipulated by the parties, covered all the cattle in the O Cross and Three Lazy S brands, estimated at from 800 to 1,200, and also the increase. It was evidently the intention of the mortgagor and mortgagee to have the mortgage cover *all* the cattle in the named brands, for it so recites, and it went further and included as security the increase. The estimate was not intended to extend to the mortgagor the power *ad libitum* to dispose of any excess of the 800 or 1,200. If so, which ones—the old cattle, the steers or cows? Surely not the increase, for they are expressly covered. To hold that the mortgage did not cover all the cattle in the two brands named would, under some authorities, make the instrument void for uncertainty, except as between the parties and claimants with actual notice. 11 C. J. 463, § 83.

We have heretofore sufficiently discussed the authority of the Mounces as the owners of the brands to dispose of and mortgage the cattle bearing their brands, and we do not deem it necessary to further discuss that.

The above finding or conclusion of the court is not supported by the evidence nor the law, except in this: That as between the Mounces and King the latter owned the cattle claimed by him, but not as between him and third persons, who, without notice and in good faith, loaned money to the Mounces or purchased cattle of them.

For the reasons we have given, the judgment of the lower court is reversed and the cause remanded, with directions that plaintiff's complaint be dismissed.

McALISTER, C. J., and LOCKWOOD, J., concur.